Before STATE INDUSTRIAL COMMISSION, Respondent.

In the Matter of the Claim of JOSEPH P. DONOVAN, Respondent, for Compensation under the Workmen's Compensation Law, *v.* ALLIANCE ELECTRIC COMPANY, Employer, and ÆTNA LIFE INSURANCE COMPANY, Insurance Carrier, Appellants.

Third Department, March 11, 1920.

**Workmen's Compensation Law — injury to head alleged to have caused " sleeping sickness " — no evidence to sustain award.**

The claimant in the course of his employment hit his head against a desk and thereafter encephalitis, commonly known as " sleeping sickness," developed and it was found that this disease was " caused by a fracture to the base of the skull " sustained by the claimant when he hit his head. *Held,* that there was no evidence to sustain the finding that claimant's skull was fractured or that his sickness was caused by the injury received and, therefore, the award should be reversed.

JOHN M. KELLOGG, P. J., and KILEY, J., dissent, with opinion.

APPEAL by the defendants, Alliance Electric Company and another, from a decision and award of the State Industrial Commission, entered in the office of said Commission on the 16th day of July, 1919.

*James B. Henney* [*William H. Foster* of counsel], for the appellants.

*Charles D. Newton, Attorney-General* [*E. C. Aiken, Deputy Attorney-General*, of counsel], for the respondents.

COCHRANE, J.:

The claimant on December 29, 1918, in the course of his employment hit his head against a desk. He worked regularly thereafter until January 16, 1919. He is now suffering from encephalitis commonly known as " sleeping sickness." The Commission finds that this disease was " caused by a fracture to the base of the skull " sustained by him when he hit his head. There is no evidence of a fractured skull. The evidence is to the contrary. At one stage of the disease the physicians thought the symptoms indicated a fractured skull but subsequent developments caused them to change their opinion. It cannot be that a tentative diagnosis in a partially developed case subject to future developments and which is changed by the later history of the case has any probative force. At most a statement of a witness out of court inconsistent with his testimony discredits the witness but is never received as evidence of the fact contained in such inconsistent statement. No physician in this case has ever testified to a fractured skull and no physician connects the present disease with the blow to the head. The Commission in its effort to make such connection has based its finding on the erroneous hypothesis of a fractured skull of which there is no evidence.

I, therefore, think the award should be reversed and the matter remitted to the Commission.

All concur, except JOHN M. KELLOGG, P. J., dissenting, with an opinion in which KILEY, J., concurs.

JOHN M. KELLOGG, P. J. (dissenting):

If we were reviewing the decision of a court in a common-law action we might question whether the determination is fairly sustained by the evidence, but the statute prohibits us from reviewing the facts as determined by the Commission. If there is no evidence to sustain a finding, the finding is erroneous as matter of law, and we must reverse it. The moment we determine there is some evidence then our power to consider the facts ceases.

The only question in this case, therefore, is, is there any evidence tending to show that the accidental injury was the cause of the claimant's disability. It is quite immaterial what name we give to the malady. We are only interested in its cause. Claimant was a well man, working continuously, and was injured upon the head. Immediately his mental condition and actions changed. He was irritable and in constant pain and suffering; was treated at home, and in a few days was taken to the hospital. He was there examined by many competent and disinterested doctors, including Dr. Kennedy and Dr. Haywood. They all declared that he was suffering from a fracture at the base of the skull. Later, Dr. Kennedy now says, he was called in two cases which he determined were " sleeping sickness," and in comparing this case with those he changed his opinion, and concluded that the claimant had " sleeping sickness," and his view seemed to have been impressed upon the other doctors.

Dr. Haywood and Dr. Kennedy were employed in this case as expert witnesses for the insurance company. Dr. Haywood, in speaking of his first diagnosis, swears: " The case didn't fit definitely into any one particular group, and I wasn't certain of the diagnosis at the time; after we got a history of the blow on the head it was reasonable to connect the injury with his condition at that time. * * * Donovan was seen by about six of the visiting medical men and surgeons of the hospital, and the consensus of opinion was that he had a fracture at the base of the skull, every one agreed to that at the time — that is, the symptoms could be all explained by such an injury; after a reasonable time, however, his symptoms didn't clear up, he didn't progress as a fractured skull should progress, and then other cases developed — there was another case in Bellevue and Dr. Kennedy had seen a couple of cases on the outside all of which fitted into one definite clinical picture, and it was then the diagnosis of encephalitis lethargica was made. * * * Q. Had any injury like this anything to do with that, do you think? A. Well, I don't know — you can say ' yes ' or ' no; ' because the only way you can connect a condition of this kind with such an injury would be by reducing the man's resistance as a result of the injury; we

don't know what the causative factor is in sleeping sickness, nobody has proven it as yet.  *  *  *  The picture of a fracture at the base of the skull is negative anyway, there is seldom you can get a picture of a fracture at the base of the skull."

Dr. Kennedy swears as to " sleeping sickness: "  " What is thought about it is that in certain periods — certain epochs — certain periods of time, a good many of us incur through one of the posteriornares the organism capable of producing this situation, and that if we get run-down, etc., we may fall a victim — i. e., our immunization, as it were, breaks down and we become a victim of the disease, same as has been proven in cerebro-spinal fever.  *  *  *  Q. Doctor, from the examinations you have made and the literature you have read, do these so-called ' sleeping-sicknesses ' follow traumas or have any connection with them?  A. No, I haven't seen any until this one in which that matter came up at all — I have seen about thirteen now, and they were all straight illness as considered apart from injuries.  *  *  *  Q. Doctor, can you give any opinion as to whether this injury he had to his head had any connection with his condition?  A. I don't like to be dogmatic about it, but the fact that in the other cases there was no connection with an injury, and the diagnosis being beyond doubt, makes me feel that the connection is one of time rather than causation, I wouldn't say there was no connection."

It must be remembered that these two physicians at the time they made the original examination and diagnosis were entirely disinterested, and, at the time of the trial, at least, were the paid physicians of the insurance company.  The question of their interest and their change of diagnosis was a proper matter for the careful scrutiny of the Commission, and its determination as to the effect to be given to their testimony was a question of fact which we cannot review.  The claimant was not represented by counsel at the hearings.  It is apparent that it cannot be said with certainty that a patient suffered from a fracture at the base of the skull or from " sleeping sickness " until an autopsy is made.  It is common experience that where the disease is obscure a wrong diagnosis may be made, and this case proves that rule.

The so-called " sleeping sickness " is not well understood.

It is a very obscure disease. No one knows its cause. It is not clear that it does not at times result from traumatism. The hospital records stand in the case as some evidence that the disability arose from a fracture at the base of the skull. The claim filed shows the same thing. The original report of the examining physician is to the same effect.

We see that the doctors disagree with themselves. The fact, however, remains that a well man received an injury upon the head, and there was an immediate change in his mental condition and his actions; his condition grew worse from day to day. The natural inference is that the accidental injury to the head must have had some effect in producing the present condition. The fact that so many able physicians all united in an opinion after examining the patient is some evidence in favor of the claimant. We know so much about experts and the fallibility of all of them, that good common sense rises in value, and the common sense of this case is that the injury to the head and the immediate change in the mental condition of the man were not remarkable coincidences, but were cause and effect. There may be a feeling that the law goes too far in saying that the decision of the Commission on questions of fact is final, but if the law is at fault, the Legislature, and not the courts, should remedy it. In my judgment there is some evidence, and no reversible error appears. I, therefore, favor affirmance.

KILEY, J., concurs.

Award reversed and matter remitted to the Commission.